UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

VIRGINIA S. CRABTREE,

        Plaintiff,

                               Case No. 2:12-cv-1206
      v.                        JUDGE GREGORY L. FROST
                               Magistrate Judge Norah McCann King

JEH JOHNSON,
Secretary, United States Department
of Homeland Security,

        Defendant.

## OPINION AND ORDER

This matter is before the Court for consideration of Defendant's motion for summary judgment (ECF No. 25), Plaintiff's combined memorandum in opposition and motion to strike EEO decision and hearsay (ECF No. 30), Defendant's reply memorandum (ECF No. 31).  For the reasons that follow, the Court **GRANTS** Defendant's motion for summary judgment (ECF No. 25) and **DENIES** Plaintiff's motion to strike (ECF No. 30).

### I.      Background

Plaintiff, Virginia S. Crabtree, is a Hispanic female who began working in April 2007 as a Customs and Border Protection Officer assigned to the Port Columbus Office of the United States Customs and Border Patrol Division of Defendant, the Department of Homeland Security.  Plaintiff held a two-year internship, which meant that she was in a probationary status.  This arrangement provided that at the successful completion of her two-year appointment, she would be hired as a permanent employee.  A failure to complete the internship satisfactorily, however, would mean the termination of Plaintiff's employment.

1

Plaintiff was the only female officer in the Port Columbus Office, which was originally led by Port Director Craig Vette.  Her direct supervisor was originally Elbert Bays, who assumed the position of Acting Port Director in August 2008 when Vette was placed on a temporary duty assignment elsewhere.  During this period of time, two other individuals then served as acting supervisors over Plaintiff, first Customs and Border Protection ("CBP") officer Christopher Bungard from August 2008 to December 2008 and then CBP officer Frank Roy from December 2008 to March 2009.  In March 2009, Vette resumed his role as Port Director and Bays resumed his role as an officer.  These supervisors encountered five main incidents involving Plaintiff during the course of her probationary period.

The first incident involved a complaint of unprofessional behavior by Plaintiff.  In August 2008, Vette received a complaint from a customs broker (who processes paperwork for imported shipments) about Plaintiff's allegedly unprofessional behavior.  The customs broker asserted that Plaintiff did not return phone calls, provided incorrect information, and was rude. In his capacity as Acting Port Director, Bays conducted a verbal counseling session with Plaintiff; Acting Supervisor Bungard sat in on the session.  Bays addressed various concerns about Plaintiff's attitude and professionalism toward her co-workers, customs brokers, and the public.  Plaintiff denied having been disrespectful or unprofessional, but she conceded that she could become irritable.  She told Bays that, as a woman, she was not going to have the same type of reaction as a male officer would.  Bays reviewed how the behavior at issue failed to meet the CBP core competencies of professionalism and working with others and admonished Plaintiff to demonstrate that she could meet these competencies.  In a subsequent written rebuttal, Plaintiff stated that she did not believe that a single public complaint truly and accurately reflected her

professionalism.  She also stated that she had strived to carry out her assigned duties with professionalism and integrity and would continue to do so.

During the course of this litigation, however, Plaintiff now contends that the factual allegations involved in the August 2008 complaint were fabrications.  She explained in her deposition testimony that she did not state this in her written rebuttal because she was in probationary status at the time and did not want to call her supervisors liars; she also testified that she did not give the rebuttal much thought because it was done quickly.

The second incident that arose during Plaintiff's probationary period involved an overtime dispute.  In August 2008, Bungard offered Plaintiff an overtime assignment processing an airplane arriving in Columbus on September 2, 2008.  Plaintiff turned down the assignment, and Bungard then offered it to another officer.  That officer accepted the assignment and therefore became the "on call" officer for after-hours assignments from 5:00 p.m. on September 1, 2008, through 8:30 a.m. on September 2, 2008.  Thus, when a request came in requesting landing rights for a plane landing at 7:45 p.m. on September 1, 2008, the call was directed to the other officer.  Plaintiff called Bungard  to complaint that this was not fair.  Bungard explained that this grouping was pursuant to CBP policy, and after Plaintiff continued to assert that it was not fair, he stated, "I am not fucking talking about this anymore, I am not a tape recorder and I am not going to repeat myself anymore."

Bungard then contacted Bays, explained what had happened, and indicated that he was going to call Plaintiff and apologize for swearing.  Plaintiff similarly called Bays about the exchange with Bungard.  Bays had both individuals submit emails regarding the incident and met with them separately.  Plaintiff confirmed that Bungard had called and apologized for his

3

language and that she had accepted the apology.  Bays then issued Bungard a verbal warning.
Plaintiff subsequently received successful performance rating in her October 2008 annual
review, although Bays again emphasized the need for her to focus on professionalism and
working well with others.

The third incident involving Plaintiff arose two months later when Plaintiff approached
Bays in December 2008 and reported that she has received an offensive email from another CBP
officer.  Bays instructed Plaintiff to send him the email and to write a memorandum detailing her
concerns.  The email contained an attachment consisting of a series of photographs titled
"Military Humor."  These photographs included military servicemen and servicewomen holding
various signs, flying a plane while holding a purse, or riding non-military vehicles.  One picture
was of a soldier in an airplane "mooning" another airplane (*i.e.*, revealing his bare buttocks to
another airplane).

Bays indicated to Plaintiff that he agreed that the email was inappropriate.  He reported
the email to the Labor Employee Relations office and interviewed the officer who sent the email,
who claimed that he thought that as a former member of the service, Plaintiff would find the
photographs humorous.  As a result of this investigation, the officer who sent the email was
suspended by CBP Area Port Director Marc Hurteau.  Hurteau is based in Cleveland, Ohio and is
responsible for supervising port operations in Ohio, Kentucky, Indiana, and Pennsylvania.

The fourth incident involving Plaintiff occurred in March 2009.  Plaintiff was seated at
her desk when another officer, who was seated at his desk next to Plaintiff, received a telephone
call that an international flight was arriving early.  The officer told Acting Supervisor Ray that
the plane was arriving early and then turned to Plaintiff, allegedly to inform her of the

4

information.  Before he spoke, she stated, "A flight is coming early?  Was somebody going to tell me about it?"  The male officer raised his voice and said, "Listen here, lady," and Plaintiff also raised her voice and told him to speak to her professionally or not to speak to her at all."  The male officer left the office to meet the airplane.  He later complained to Bays that Plaintiff had yelled at him.

Bays had Acting Supervisor Roy submit a memorandum regarding the incident.  He also met with Plaintiff on March 4, 2009, to obtain her version.  She stated that the male officer had withheld flight information from her, had spoken to her in an unprofessional tone, and had used the term "lady" in speaking to her.  Plaintiff also stated that she was upset that Roy had failed to intervene.  Bays informed Plaintiff that he thought that the male officer had informed her of the flight information in a timely manner and that he was concerned about the argument between the officers.  Bays then addressed the need for professionalism and for working together in a subsequent meeting with officers in which he also reviewed the code of conduct provision calling for the avoidance of disruptive behavior.

The fifth incident involving Plaintiff occurred on March 16, 2009, when a female police officer stopped Plaintiff in the airport to check Plaintiff's Security Identification Display Area badge.  Plaintiff reported the event to Acting Supervisor Roy, asserting that the police officer had invaded her personal space and grabbed her badge.  Plaintiff also asserted that she questioned the police officer why her badge was being checked.  Roy informed Bays of the incident, and Bays had Roy obtain a written statement from Plaintiff.  Bays also obtained a written statement from Roy and spoke with the police officer involved.  At Bays' request, the police officer provided a letter providing her account of the encounter with Plaintiff.  The police officer's letter indicated

5

that she had randomly selected Plaintiff to check her badge and that Plaintiff had exhibited an attitude that she should be exempt from such a check.

Bays met with Plaintiff.  She now indicated that when the police officer had grabbed Plaintiff's badge, it was connected to the lanyard of Plaintiff's uniform.  Plaintiff indicated that this was an invasion of her personal space and interfered with Plaintiff's freedom of movement. Bays informed Plaintiff that he was concerned about her attitude and authority issues.  He stated that he believed she was being "badge heavy" and advised Plaintiff to focus on her job duties instead.

As noted, Vette resumed his duties as Port Director in March 2009.  Shortly thereafter, he received a written recommendation from Bays that Plaintiff not be given a permanent position at the end of her probationary period.  In making this recommendation, Bays relied on guidance from the Labor Employee Relations office and written input from Bungard and Roy.  Bays stated that Plaintiff lacked professionalism and had demonstrated an unwillingness to follow orders while also demonstrating a willingness to argue with management decisions.  Vette met with Bays about these concerns, in addition to speaking with Bungard and Roy about Plaintiff's conduct.  Finally, Vette consulted with Area Port Director Hurteau and recommended to Hurteau that Plaintiff be terminated before the end of the probationary period.  Hurteau, who had never met Plaintiff, reviewed the written and oral recommendations that he had received and concluded that Plaintiff be terminated from her position.  Plaintiff was the third probationary employee that Hurteau had terminated during the 2007-2009 period, with the other two individuals both being male.

On April 28, 2009, Plaintiff was summoned into Bay's office.  Vette was also present.

6

They presented Plaintiff with a memorandum from Hurteau indicating that her employment would end on April 29, 2009.  Plaintiff was allowed to write a rebuttal and, while doing so, verbally accused Vette and Bays of racism and gender discrimination.  Plaintiff was eventually escorted from the Port Columbus office.

In June 2009, Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC").  An administrative law judge held a two-day evidentiary hearing on the complaint.  Some of the hearing allegations were new.  For example, although Plaintiff's original complaint to Bays about the "Military Humor" email did not raise the issue of sexual harassment, Plaintiff asserted in her EEOC hearing that her memorandum was a sexual harassment complaint.  She asserted that the exposed buttocks photograph included "hanging genitals," a fact that she did not allege previously.  The administrative law judge entered an order finding no discrimination.

Plaintiff subsequently filed the instant action in December 2012.  In a two-count complaint, she asserts claims for sex discrimination and retaliation, both under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.*  (ECF No. 1 ¶¶ 16-22.)  Unlike in the EEOC proceeding, Plaintiff's complaint does not assert that she had been discriminated against based on her ethnicity, that she had been prevented from contacting the EEOC, or that her final paycheck was erroneous.  Defendant has filed a motion for summary judgment (ECF No. 25) on the claims asserted in the complaint, and Plaintiff has filed a motion to strike (ECF No. 30) references to the EEOC decision and to hearsay statements made in the course of the EEOC proceedings.  The parties have completed briefing on the motions, which are ripe for disposition.

## II.       Motion to Strike

The record before this Court includes a copy of the administrative law judge's decision that resulted from the EEOC proceedings and a transcript of the two-day hearing that took place as part of those proceedings.  In her memorandum in opposition, Plaintiff includes a request for this Court to strike the EEOC decision, as well as any hearsay testimony and various references to unspecified individuals in the hearing transcript.

Much of Plaintiff's motion is moot.  Because the Court has not considered the administrative law judge's decision or any references summarizing its substantive content, the document need not be stricken to achieve Plaintiff's goal.  Additionally, the Court has not considered the references to unspecified "other officers," "supervisors," or "other brokers," which negates the need to strike the references.

The remainder of Plaintiff's motion is folly.  Plaintiff has failed to direct this Court to any specific hearsay references in the hearing transcript or to present any briefing on why a piece of testimony constitutes hearsay and should be disregarded.  In other words, Plaintiff wants this Court to search for and find hearsay, come up with the arguments for and against its admissibility, and then rule for the exclusion of such testimony.  But the inadequate briefing cannot provide Plaintiff the evidentiary relief she wants for three overlapping reasons.  First, "[i]t is neither this Court's role nor its desire to litigate a case on behalf of any party." *Younker v. Ohio Dep't Rehab. & Corr.*, No. 2:13-cv-746, 2014 WL 559250, at *2 (S.D. Ohio Feb. 11, 2014).  Second, " '[t]his Court is in the business of resolving the legal arguments presented to it, not in creating a party's inferred argument for [her] and then passing judgment on it.' " *Lott v. Havar, Inc.*, No. 2:12-cv-608, 2013 WL 2468351, at *4 (S.D. Ohio June 7, 2013).  Third, just as

this Court ' 'has no duty when deciding a motion for summary judgment to scour the record for evidence to support a [party's] claims," the Court has no duty to search the record for evidence that might be harmful to a party's claims.  *BAC Homes Loans Serv., L.P. v. Fall Oaks Farm LLC*, No. 2:11-cv-274, at * (S.D. Ohio Jan. 10, 2013) (quoting *AbdulSalaam v. Franklin Cnty. Bd. of Comm'rs*, 637 F. Supp. 2d 561, 576 (S.D. Ohio 2009).

This Court **DENIES** the motion to strike.  (ECF No. 30.)

### III.    Summary Judgment Motion

#### A.  Standard Involved

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial.  *Id*. (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).  Consequently, the central issue is " 'whether the evidence

9

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52).

### B.   Analysis

Title VII provides that "[i]t shall be an unlawful employment practice for an employer...to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . or to limit, segregate, or classify his employees ... in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex . . . ." 42 U.S.C. §§ 2000e-2(a)(1)-(a)(2).  Title VII also provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]." *Id.* § 2000e-3(a).  As noted, Plaintiff asserts claims for sex discrimination and retaliation under Title VII, and Defendant seeks summary judgment on both claims.

Defendant first argues that it is entitled to summary judgment on Plaintiff's sex discrimination claim because Plaintiff cannot establish a *prima facie* case of such discrimination. In a typical sex discrimination claim under Title VII, courts first ask whether the plaintiff is presenting direct evidence of discrimination or circumstantial evidence that would allow an inference of discriminatory treatment.  *Anthony v. BTR Auto. Sealing Sys., Inc.*, 339 F.3d 506, 514 (6th Cir. 2003) (citing *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003)).  Where, as here, a plaintiff relies on circumstantial evidence, courts utilize the burden-

shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  *Anthony*, 339 F.3d at 514.  Under this approach, the plaintiff faces the initial burden of presenting a *prima facie* case of discrimination.  *Id.* at 515.

      In order to establish a *prima facie* case, Plaintiff must demonstrate that "(1) she is a member of a protected class, (2) she was subjected to an adverse employment action, (3) she was qualified, and (4) she was treated differently than similarly-situated male . . . employees for the same or similar conduct."  *Martin v. Gen. Elec. Co.*, 187 F. App'x 553, 558-59 (6th Cir. 2006).  Defendant argues that Plaintiff cannot meet the fourth prong by showing that any similarly situated male employees were treated more favorably than her.

      For an individual to be similarly situated to a plaintiff, a plaintiff must demonstrate that she and her proposed comparator are "similar in 'all of the relevant aspects.' "  *Id.* (citing *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)).  Generally, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Id.* (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).  But Plaintiff has failed to point to any similarly situated male employee who satisfies the requisite criteria.

      Three points are warranted.  First, although Plaintiff generally references male co-workers, none of these individuals were probationary workers like Plaintiff.  This means that there was a difference in the greater employment protections afforded those workers versus the

more limited employment protections Plaintiff held, which arguably informs whether Plaintiff and her co-workers were subject to *all* of the same standards.  Although the evidence supports that the same institutional core competencies extended to both classes of workers, the evidence also supports that in light of her probationary status, Plaintiff as a probationary employee held fewer protections against removal from employment than her non-probationary co-workers.  A degree of different treatment by management was thus permissible.  *See Nat'l Treasury Emp. Union v. Fed. Labor Relations Auth.*, 737 F.3d 273, 276-77 (4th Cir. 2013).

Second, there is no evidence that Plaintiff's male co-workers engaged in the same conduct as Plaintiff without such differentiating or mitigating circumstances that would distinguish their conduct or Defendant's treatment of them for it.  This is important in light of the Sixth Circuit's recognition in another Title VII discrimination case that

> sharing the same supervisor and being subject to the same standards are not sufficient for establishing that non-minority employees are similarly-situated.  A plaintiff must also show that the non-minority employees "have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."

*White v. Ohio*, 2 F. App'x 453, 457 (6th Cir. 2001) (quoting *Mitchell*, 964 F.2d at 583). Surveying cases, the court of appeals also noted that "[c]ase law further challenges a finding that probationary and permanent employees are similarly-situated."  *Id.* (collecting cases).

Here, the nature, degree, and volume of arguable unprofessionalism exhibited by some of Plaintiff's male co-workers vary from the unprofessionalism exhibited by Plaintiff.  This variance does not favor Plaintiff.  The male employees, who as non-probationary employees held greater protections regarding their employment than Plaintiff held, did not engage in the same sort of continuous problematic behavior that Plaintiff exhibited.  When some of the workers

exhibited unprofessional behavior, such the individual who sent the "Military Humor" email, discipline ensued.  This stands in contrast to Plaintiff's evasion of discipline for each instance of her unprofessionalism until the cumulative effect of her conduct led to her termination from employment.

Third, there is no evidence that Defendant treated male probationary employees better than Plaintiff.  The two other probationary workers addressed in the evidence before this Court were both males, and they were both also terminated by Hurteau during the relevant 2007-2009 time period.  In each instance, Hurteau followed the same process that he employed for Plaintiff. (ECF No. 25-1, at Page ID # 841.)

Plaintiff has thus failed to establish a *prima facie* case of sex discrimination.  This means that Defendant is entitled to summary judgment on Plaintiff's first claim, provided that the scope of that claim is as limited as discussed above.  However, Plaintiff has introduced uncertainty into this Court's regarding the first claim as fully addressed.

The first claim of the complaint includes a hostile work environment component. Plaintiff raises the issue of a hostile work environment in the factual allegations of her complaint. (ECF No. 1 ¶ 15 ("Plaintiff did not report any further misconduct or incidents creating a hostile working environment because she was afraid of losing her job.").)  She then incorporates that allegation in Count I of the complaint.  (Id. ¶ 16 ("Plaintiff realleges the facts contained in paragraphs 1 through 15 of her Complaint.").)  Finally, Plaintiff expressly pleads in Count I that "Defendants [*sic*] discriminated against Plaintiff on the basis of her sex, female, by treating her differently in the terms and conditions of employment *and by creating a hostile working environment for women*."  (ECF No. 1 ¶ 18 (emphasis added).)  This would appear to raise a

hostile work environment component as part of the first claim.  In her memorandum in

opposition, however, Plaintiff includes the following section, reproduced in its entirety:

> **6.    PLAINTIFF DOES NOT BRING A HOSTILE ENVIRONMENT CLAIM.**
>
> Much of Defendant's Brief argues that Plaintiff's evidence does not rise to the level of a sexually hostile environment.  The "hostile environment" claim is a type of sex discrimination claim most often brought in the context of sexual harassment.  Plaintiff does not bring a hostile environment or sexual harassment claim.  Rather, she brings a traditional sex discrimination claim.  An environment hostile and disrespectful to women can be evidence on a traditional sex discrimination claim.

(ECF No. 30, at Page ID # 1086.)  This section of Plaintiff's brief either contradicts her

complaint or is intended to narrow the scope of the first claim by abandoning or dropping from

that claim the hostile work environment component pled.  At the same time, however, Plaintiff

seeks to utilize evidence of an alleged hostile work environment to support her "traditional sex

discrimination claim."

The Sixth Circuit has held that "a plaintiff is deemed to have abandoned a claim when a

plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of*

*Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013).  This Court therefore recognizes that

Plaintiff's memorandum in opposition constitutes abandonment of a hostile work environment

component to the first claim.  At the same time, the Court recognizes that the selective

abandonment seeks to utilize the evidence (and standards?) relevant to that claim to support the

non-abandoned component of Count I.  In other words, Plaintiff apparently wants to prove her

disparate treatment claim by relying on evidence that sex discrimination generally created a

hostile work environment.

In an effort to cover all possible bases and remove any uncertainty, the Court shall explain why there would be no successful hostile work environment claim here even if it were not apparently abandoned and explain why the evidence offered to establish the existence of a hostile work environment also fails to salvage the disparate treatment discrimination claim presented in Count I.

To prove a hostile work environment claim, a plaintiff must show that

> the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . . Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment–an environment that a reasonable person would find hostile or abusive–is beyond Title VII's purview.  Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Virgilio v. Potter*, 59 F. App'x 678, 681 (6th Cir. 2003)  (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-23 (1993)) (internal quotes and citations omitted).  In light of this standard, Defendant argues that the purported "harassment" of which Plaintiff complains was not severe and pervasive enough and that Defendant reacted appropriately to those complaints of harassment about which it knew.  This Court agrees with both propositions.

The touchstone of a hostile work environment claim is thus proof that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' "  *Harris*, 510 U.S. at 21 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)).  There is both an objective and a subjective prong to this standard.  In other words, "the conduct must be severe or pervasive enough to create an environment that a reasonable

person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Black v. Zaring Homes*, 104 F.3d 822, 826 (6th Cir. 1997) (citing *Harris*, 510 U.S. at 21–22).  Consequently, the question before the Court is whether a reasonable person would have found Plaintiff's work environment to be hostile or abusive.

In answering this question, the Court must consider various factors including "[t]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.  Although the work environment as a whole must be viewed by the Court, including all alleged acts of harassment or abuse, if such acts are irregular and sporadic rather than continuous and frequent, it is much more difficult to prove a hostile work environment claim.  *See id.*  This is because "not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." *Meritor Sav. Bank, FSB*, 477 U.S. at 67.  For example, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.' " *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citations omitted).

Here, there is no evidence that Plaintiff was harassed or discriminated against based on her gender; no reasonable factfinder could conclude that many of Plaintiff's allegations present gender-based and severe conduct.  Rather, the incidents upon which she relies are objectively gender-neutral situations with two arguably improbable exceptions.

First, to the extent that the use of "Listen here, lady" by another officer during the March 2009 incident introduces gender into the events, there is no evidence that gender played a

16

motivating role in the slight delay Plaintiff experienced in being informed of when the international flight was to land.  Second, to the extent that the "Military Humor" email can be regarded as not gender neutral, it was a discrete event that management promptly and effectively addressed.

This last point is important because the Sixth Circuit has stated that "[t]he act of discrimination by the employer in [a hostile work environment case] is not the harassment, but rather the inappropriate response to the charges of harassment."  *McCombs v. Meijer, Inc.*, 395 F.3d 346, 353 (6th Cir. 2005).  Thus, "when the allegations of sexual harassment involve a coworker and the employer has fashioned a response, the employer will only be liable 'if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known.' "  *Id.  See also Mast v. IMCO Recycling of Ohio, Inc.*, 58 F. App'x 116, 119 (6th Cir. 2003) ("If the harasser was merely the plaintiff's co-worker, the employer will be liable only where the plaintiff can demonstrate that the employer knew or should have known of the harassment and failed to take appropriate remedial action." (citing *EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 518 (6th Cir. 2001))); *Courtney v. Landair Transp., Inc.*, 227 F.3d 559, 564-65 (6th Cir. 2000)).  Consequently, Plaintiff's hostile work environment claim fails. Management investigated each incident that Plaintiff brought to its attention and acted appropriately.  In the specific case of the "Military Humor" email, for example, CBP Area Port Director Hurteau suspended the officer who sent the email after an investigation was conducted.

Moreover, necessarily construing all of the evidence in a light most favorable to Plaintiff, the Court concludes that the conduct complained of does not rise to the level of harassing or discriminatory conduct presenting a hostile work environment.  The distinct incidents about

17

which Plaintiff complains are often so discrete and are so lacking in severity that they could

hardly be regarded under the totality of the circumstances as permeating the workplace with

discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to affect

Plaintiff as she claims to have been affected.  Although Plaintiff may have indeed been

subjectively upset, her subjective perspective is insufficient to salvage her claim.  In another

hostile work environment case, this Court explained why subjective perceptions of minor events

fail to sustain a hostile work environment claim:

> This is not to say that Plaintiff was without any amount of cause to find
> the manner in which he was at times treated or the manner in which other
> employees interacted with him upsetting.  But upsetting does not always equal
> unlawful.  Plaintiff must recognize that Title VII does not exist to ensure that
> everyone who works together enjoys one another's company or personality.  Title
> VII is simply not a general civility code.  *See Faragher*, 524 U.S. at 788 ("These
> standards for judging hostility are sufficiently demanding to ensure that Title VII
> does not become a 'general civility code.' ").  *See also Black*, 104 F.3d at 826
> ("Title VII was 'not designed to purge the workplace of vulgarity' " (quoting
> *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.1995))).  Thus, the
> relatively meager instances of discourtesy or rudeness involved here cannot be
> confused with serious harassment or discrimination premised upon impermissible
> grounds such as gender.  *See Faragher*, 524 U.S. at 787.  While not excusing the
> treatment or behavior reflected in the evidence, the Court must nonetheless
> recognize that the instances of asserted impropriety do not amount to
> discriminatory changes in the terms and conditions of Plaintiff's employment.
> *See id.* at 788. There is simply no basis for linking any of the treatment about
> which Plaintiff complains to gender, and none of this conduct was severe and
> pervasive.

*Lott*, 2013 WL 2468351, at *8.  The same rationale applies here.

Equally unpersuasive for Plaintiff is her reliance on various comments made by male co-

workers concerning female employees whom Plaintiff did not know.  These comments were not

directed at Plaintiff specifically and were not targeted at her gender generally.  Rather, they were

at most arguably offensive utterances that failed to create an objectively hostile work

18

environment.  This is important because it punctures Plaintiff's apparent hope to use the

purported "culture" of her former workplace to support the remaining component of her Count I

discrimination claim.

Although Plaintiff may have often found the manner in which other employees interacted

with her or with one another distasteful or upsetting, this Court has explained that "Title VII does

not exist to ensure that everyone who works together enjoys one another's company or

personality.  Title VII is simply not a general civility code."  *Winfield v. Gates*, No. 2:09-cv-244,

2010 WL 5014497, at *5 (S.D. Ohio Dec. 3, 2010) (citing *Faragher*, 524 U.S. at 788 ("These

standards for judging hostility are sufficiently demanding to ensure that Title VII does not

become a 'general civility code.' "); *Black*, 104 F.3d at 826 ("Title VII was 'not designed to

purge the workplace of vulgarity' ")).  Thus, this Court reaches the same conclusion here that it

did in *Winfield*:

> The relatively meager instances of discourtesy or rudeness involved here cannot
> be confused with serious harassment or discrimination premised upon racial or
> other impermissible grounds.  *See Faragher*, 524 U.S. at 787.  While not excusing
> the treatment or behavior reflected in the evidence, the Court must nonetheless
> recognize that the instances of asserted impropriety do not amount to
> discriminatory changes in the terms and conditions of [the plaintiff's]
> employment.  *See id.* at 788.

*Id.* at *5.  The sex-based comments about other females spoken in Plaintiff's presence, which

Plaintiff never reported to management, fails to rise above the level of the merely offensive or

inappropriate.  Additionally, the Sixth Circuit has held that "[e]vidence of other sexual

harassment claims may help support a hostile work environment claim, but evidence of

harassment to others does not weigh as heavily as evidence directed against the plaintiff."  *Warf

v. U.S. Dep't of Veterans Affairs*, 713 F.3d 874, 878 (6th Cir. 2013).  The Court concludes that

there is no hostile work environment claim, to the extent one ever existed in this case.  More

importantly, the Court also recognizes that the evidence for the non-existent hostile work

environment to which Plaintiff points is insufficient to demonstrate the disparate treatment about

which Plaintiff complains.  Defendant is thus entitled to summary judgment on the entirety of

Count I.  *See Black*, 104 F.3d at 826.

Defendant also argues that it is similarly entitled to summary judgment on Plaintiff's

Count II retaliation claim because Plaintiff again cannot establish a *prima facie* case.  In order to

establish a *prima facie* case of retaliation, a plaintiff must prove that

> (1) he or she engaged in protected activity, (2) the employer knew of the exercise
> of the protected right, (3) an adverse employment action was subsequently taken
> against the employee, and (4) there was a causal connection between the protected
> activity and the adverse employment action.

*Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 344 (6th Cir. 2008) (citing *Morris v. Oldham*

*Cnty. Fiscal Court,* 201 F.3d 784, 792 (6th Cir. 2000)).  Defendant attacks Plaintiff's ability to

satisfy the fourth prong.

Plaintiff asserts that direct evidence of retaliation exists because Bays purportedly told

her that he had had enough of her and that it was easy to emerge from the probationary period by

staying under the radar.  Because these comments require an inference in order to support the

connection Plaintiff seeks to establish, they are at best circumstantial evidence.  When viewed in

context, however, they do not even point to retaliation.

As discussed above, Plaintiff has failed to show that she was treated less favorably than

any similarly situated co-worker after engaging in protected behavior so as to suggest a requisite

causal connection.  Plaintiff is thus left only with the temporal proximity between the protected

activity in which she engaged and the adverse action she experienced.   The Sixth Circuit has

explained, however, that its "precedent is clear that mere temporal proximity between an

assertion of Title VII rights and a materially adverse action, without other indicia of retaliatory

conduct, is not sufficient to establish the causal connection element of a retaliation claim."

*Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 770 (6th Cir. 2008).  Thus, unless immediate,

temporal proximity must be "coupled with other indicia of retaliatory conduct" to give rise to a

causal inference.  *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588–89, 595 (6th Cir. 2009).

 Here, however, there is a notable lapse of time between most of Plaintiff's complaints

and the adverse action of her termination.  Plaintiff has failed to direct this Court to any other

indicia of retaliatory conduct.  Although Plaintiff argues in her briefing that the basis of her

retaliation claim is the "under the radar" incident—that she was retaliated against for this last

complaint—Plaintiff fails to offer any evidence of a causal inference.  In other words, she has

failed to offer evidence sufficient to raise an inference that this last complaint was the *likely*

reason for her termination.  *Thompson v. UHHS Richmond Heights Hosp., Inc.*, 372 F. App'x

620, 627 (6th Cir. 2010) ("To demonstrate a causal connection between a materially adverse

action and the exercise of protected rights, 'a plaintiff must proffer evidence sufficient to raise

the inference that [the] protected activity was the likely reason for the adverse action.' "

(quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007)).  The Court

therefore concludes that Plaintiff has failed to present evidence or raise a genuine issue of

material fact related to the existence of a causal connection between her complaint to

management of discrimination and her subsequent separation from employment.  Consequently,

Plaintiff has not established a *prima facie* case of retaliation.

The analysis to this point is enough to entitle Defendant to summary judgment on the entirety of Plaintiff's complaint.  This Court recognizes, however, that additional reasons support today's decision even if Plaintiff had presented *prima facie* cases for her claims.

Once a plaintiff meets the initial burden of establishing a *prima facie* case of discrimination or retaliation, the burden shifts to the defendant to present a legitimate non-discriminatory reason why the plaintiff suffered an adverse employment action.  *See Martin*, 187 F. App'x at 559; *Hagan v. Warner/Elecktra/Atlantic Corp.*, 92 F. App'x 264, 267 (6th Cir. 2004) (citing *Mitchell*, 964 F.2d at 582).  In accordance with this shifting of burdens, Defendant has pointed to non-discriminatory reasons for terminating Plaintiff's probationary employment: she was unprofessional and did not work well with others.

After Defendant has met this burden of production, Plaintiff now has the burden to demonstrate that the reason offered by the defense was pretexual.  *See Martin*, 187 F. App'x at 559; *Hagan*, 92 F. App'x at 267.  In order to prove that either of Defendant's proffered reasons are pretexual here, Plaintiff must demonstrate that (1) the proffered reason had no basis in fact, (2) the proffered reason did not actually motivate the adverse employment decision, or (3) the proffered reason was insufficient to motivate the adverse employment action.  *Koval v. Dow Jones & Co.*, 86 F. App'x 61, 66 (6th Cir. 2004) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).  She "must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer*, 29 F.3d at 1083.  In other words, Plaintiff must offer evidence that "circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Id.* at 1084.

22

Plaintiff has failed to meet her burden.  This Court reaches such a conclusion in part as a result of the honest belief rule.  The court of appeals has explained the essential inquiry related to this rule:

> In deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned.  Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.
>
> If there is no material dispute that the employer made a "reasonably informed and considered decision" that demonstrates an "honest belief" in the proffered reason for the adverse employment action, the case should be dismissed since no reasonable juror could find that the employer's adverse employment action was pretextual.

*Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001) (internal citation omitted; quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)).  Thus, it is well settled that to puncture a legitimate reason for termination of employment and establish pretext, a "plaintiff must allege more than a dispute over the facts upon which [her] discharge was based.  [She] must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action."  *Braithwaite*, 258 F.3d at 493-94 (citing *Smith*, 155 F.3d at 806-07).

There is no material dispute here over whether Defendant made a reasonably informed and considered decision that demonstrates an honest belief in the proffered reason for the treatment Plaintiff received.  Hurteau testified at some length during the EEOC hearing as to the decision-making process he employed.  This involved conducting an inquiry into relevant considerations surrounding the Vette recommendation, in addition to reading reports from the first line supervisors.  All of this material presented Plaintiff's lack of professionalism.  He

23

testified that he did not consider Plaintiff's gender in making his decision and that he was unaware whether she had engaged in any EEOC activity.  None of this was important to him, Hurteau testified; rather, what was important was whether Plaintiff was suitable to be retained in her position.  Additionally, Hurteau had never met Plaintiff and had no recollection of her.  (ECF No. 25-1, at Page ID # 838-41.)

The foregoing evidence supports that Hurteau honestly held the belief that Plaintiff had engaged in unprofessional behavior.  It is well settled that the fact that an employment decision is based on subjective criteria is not itself evidence of pretext.  *Chattams v. Donahoe*, No. 3:09-cv-187, 2011 WL 5167165, at *8-9 (S.D. Ohio Oct. 31, 2011); *see also Russell v. Lew*, 549 F. App'x 389, 395 (6th Cir. 2013) (recognizing that the fact that reviews "involved a subjective component is not sufficient evidence of pretext").  It is simply a factor to be considered in conjunction with other evidence of pretext, of which there is none in this case.

Also important is that, in deciding whether an employer reasonably relied on the particularized facts before it, "it is inappropriate for the judiciary to substitute its judgment for that of management."  *Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000).  The principal function of the Court is not to second-guess the business judgment of an employer, but rather to determine "whether the employer gave an honest explanation of its behavior."  *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004).  Therefore, the focus is not on whether the decisional process used by an employer was optimal or left no stone unturned; it is on "whether the employer made a reasonably informed and considered decision before taking an adverse employment action."  *Smith*, 155 F.3d at 807.  The decision maker here did.  Although

24

he did not speak with Plaintiff, Hurteau reviewed numerous reports on her conduct and came to the conclusion that it fell beneath the necessary standards of her employment.

Plaintiff in turn has failed to meet her consequent burden of producing evidence showing that Defendant did not have an honest belief in its proffered reason for her termination.  Instead, she argues that everyone who supervised her in Columbus held a discriminatory intent against her, including Bays specifically, and that this animus tainted the decision making of Hurteau, the individual who ultimately made the termination decision.  But Plaintiff lacks evidence of a discriminatory or retaliatory animus.  This matters because it is Plaintiff's obligation to offer evidence of a causal nexus between such animus held by her supervisors and Hurteau's decision to terminate her employment.  *See Bishop v. Ohio Dep't of Rehab. & Corr.*, 529 F. App'x 685, 696 (6th Cir. 2013).

Additionally, there is no evidence suggesting (or genuine dispute of fact over whether) Hurteau functioned as a mere rubber stamp for the decision to terminate Plaintiff's employment, which again removes this case from application of the cat's paw theory that Plaintiff seeks to invoke.  *See id.*  As the Sixth Circuit has noted, "a causal nexus is lacking if the ultimate decision 'was based on an independent investigation' and the employee 'presented no evidence that the supervisor's discriminatory animus had influenced the decision.' "  *Id.* (quoting *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 678 (6th Cir. 2008).  Plaintiff ignores that Hurteau's process involved the solicitation of independent reviews by the supervisors, making his own inquiries as to what had been done, and, coming to his own conclusion as part of his independent review.

25

Because there is no material dispute that Defendant made a reasonably informed and considered decision that demonstrates an honest belief in the proffered reason for Plaintiff's termination, no reasonable juror could find pretext.  Defendant is entitled to summary judgment on the complaint.

## IV.    Conclusion

For the foregoing reasons, the Court **GRANTS** Defendant's motion for summary judgment (ECF No. 25) and **DENIES** Plaintiff's motion to strike (ECF No. 30).  The Clerk shall enter judgment accordingly and terminate this action on the docket records of the United States District Court for the Southern District of Ohio, Eastern Division.

**IT IS SO ORDERED**.

_____/s/ Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE
